THE MYRTLE TUNNEL.

(District Court, D. South Carolina. July 3, 1906.)

1. SALVAGE—CONTRACT TO DELIVER STRANDED VESSEL—FAILURE OF PERFORM-
ANCE.

A tug which was under a written contract to float and deliver a stranded schooner at a stated port, the contract otherwise to be void, but which failed to perform the contract, cannot recover compensation as salvage for services rendered in attempting its performance, as a result of which the schooner was subsequently floated by the wind and tide, and became a derelict, and exposed to greater peril than when on the bank, until rescued by other vessels after her abandonment by the tug.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, § 30.]

2. SALVAGE—AWARD OF COMPENSATION—RULE IN CASE OF DERELICT.

The ancient rule for the allowance of a moiety of the value saved in the salving of a derelict to the salvors, while somewhat flexible, and subject to change in extraordinary cases, is a safe and salutary limit upon judicial discretion, and not to be lightly disregarded.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 56, 65.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

3. SAME—FACTS CONSIDERED.

A large schooner became stranded on Frying Pan Shoals off the North Carolina coast in March. A contract was made with the owner of tugs to float the schooner and deliver her at a port, but the effort was unsuccessful. Ten days after the stranding, and after she had been abandoned by the master and crew, she was moved off the shoal by a high wind, and one of the tugs attempted to tow her to port, but was unable and abandoned her. Her hull was under water and her masts and rudder gone. Subsequently a tug from Savannah went in search of and found her, about 100 miles from Charleston, which was the nearest port she could enter owing to her draft. After going to Charleston, and obtaining the assistance of two other tugs, she was again found, and the three tugs towed her to that port nearly 10 days after she had gone adrift. Meantime the insurer had sent out a tug, which made a search for her, but not in the locality where she could have been found. She was sold with her cargo for $24,000. The salvage service was performed with skill, and at considerable trouble and risk, owing to her condition. Held, that she was a derelict, and that the salvors were entitled for their services to one-half the proceeds of vessel and cargo after payment of the expenses and costs.

In Admiralty. On libels for salvage.

Thomas Evans, for the Blanche.

Bryan & Bryan, for the Propeller Tow Boat Company.

Mitchell & Smith, for the Protector.

Miller & Whaley, for claimants.

BRAWLEY, District Judge. The four-masted schooner Myrtle Tunnel, of about 1,400 tons burden, laden with cross-ties from the port of Brunswick, Ga., bound for Philadelphia, went ashore on Frying Pan Shoals, N. C., March 6, 1906. The steam tug Blanche, of Wilmington, went to her the next day, and offered assistance, but the same was refused by the master of the Tunnel until he could communicate with his owners. A telegram was sent by the mate of the Tunnel to George A. Tunnel, managing owner, Philadelphia, who immediately went to Wilmington, N. C., arriving there March 11th. W. A. Sanders, general manager of the Wilmington, Southport & Little River Company, owner of the tugboats Blanche and Isabel, met Tunnel at the railroad station, and arranged to carry him to the wrecked schooner. On March 12th the contract in writing was made by Sanders, representing the company above named, and George A. Tunnel, whereby said company agreed to "float and deliver the schooner Myrtle Tunnel to Southport, N. C.," the amount to be paid for such service to be decided by two practical men, one chosen by Tunnel and one by the tugboat company, and, if they did not agree, they were to choose a third, whose decision must be final.

Libels have been filed in behalf of the steam tug Blanche, of Wilmington, and in behalf of the steam tugs McCauley and Paulsen, of Savannah, and the steam tug Protector, of Charleston, which by order of the court were consolidated and heard together.

First will be considered the claims of the Blanche. After the signing of the contract referred to, which was made an exhibit to the libel, the Blanche went down to the schooner March 13th, carrying, in addition to her crew, about 17 men to assist in lightening the vessel. On their arrival it was found that all of the deck cargo of the Myrtle Tunnel had been jettisoned by the crew of the vessel, aided by the crew of the revenue cutter Seminole. The hands from the Blanche went to work, and jettisoned the cross-ties that were stowed between decks, and at high water on the afternoon of that day the Blanche, with a small tug, Isabel, owned by the same company, and the revenue cutter Seminole pulled on the schooner, but failed to move her off the shoal, and the Blanche and the Isabel returned to Southport. The revenue cutter Seminole took off the crew of the Myrtle Tunnel, her sails, ropes, and all of the personal effects of the crew, and carried them to Southport. Nothing further was done by the Blanche or Isabel until the 16th, when it appears that a high wind moved the Myrtle Tunnel off the shoal. The Blanche took hold of her about 11 o'clock that night, and pulled on her until 6 o'clock the next morning, when, according to the testimony of her master, it was blowing a gale of wind, and the schooner was carrying him off shore, when he cut adrift from her. The weather reports of Wil-

mington show that the greatest velocity of the wind on March 16th was 15 miles, and the master of the Isabel testifies that there was no storm on the 16th, not more than a 20-mile breeze; that "it might not have been that much—might not have been over 15, or somewhere along there." The master of the Blanche testifies that he cruised around for the next day or two, looking for her, but it also appears that the tug was engaged in her ordinary avocation of towing vessels. The Blanche is about 94 feet long, but the witnesses did not know her horse power. She is allowed about 125 pounds steam. "Salvage services," says the Supreme Court in the Elfrida, 172 U. S. 192, 19 Sup. Ct. 148, 43 L. Ed. 413, "are either (1) voluntary, wherein the compensation is dependent upon success; (2) rendered under a contract for a per diem or a per horam wage, payable at all events; (3) under a contract for a compensation payable only in case of success." Under the written contract, libelants agreed to "float and deliver the schooner Myrtle Tunnel, now ashore on Frying Pan Shoals, to Southport, N. C." There is a supplemental stipulation that, if the schooner Myrtle Tunnel fails to float, this contract is null and void. That libelants failed to deliver the schooner at Southport in accordance with their contract is plain, and although courts of admiralty have a wide discretion in the awarding of compensation for salvage services, yet when parties entirely free to do so have made a contract, they are bound by its terms, and the case does not differ from that of any other contract wherein one party agrees to do something, for the doing of which the other party agrees to pay something. In all such contracts the party who is to pay is not compelled to do so until the thing to be done is performed. In Bondies v. Sherwood et al., 22 How. 214, 16 L. Ed. 238, it was held that when libelants by their own showing cannot recover under the contract, they cannot repudiate it, and libel the vessel for salvage. Here the libelants, although setting forth the contract which they have admittedly not performed, claim for a salvage service that in lightening the cargo they enabled the vessel to float, and inasmuch as being afloat she was afterwards saved by others, their services should be rewarded. The first effect of the lightening of the cargo, the wind being in the quarter where it was, would have been to move the schooner higher upon the shoal. The Blanche and Isabel were evidently tugs of no great power, not equipped with kedges or heaving cables, or other apparatus suitable for wrecking purposes, and, assisted as they were by the revenue cutter Seminole, their efforts to get the vessel off the shoal were ineffectual, and after pulling upon her for about an hour they left her, and returned to Southport. The vessel got off the shoal by reason of a change in the direction of the wind and of an increase in its velocity. After she was afloat, the Blanche took hold of her about 11 o'clock on the night of the 15th, and remained with her until the next morning, when she cut adrift, leaving the schooner without a crew, without sails, and without a rudder, to the mercy of the winds and waves. Thus adrift she was in greater danger than when on the shoal, a helpless derelict, at great risk of becoming a total loss, and a terror to all seafarers. It is of the very essence of a salvage service

that it has contributed to the rescue of the property in peril at sea.

Success is an essential ingredient, and however meritorious the service, or benevolent the intentions, or arduous the labor, if it is not attended by beneficial results no reward can be given. Failure may be the result of conditions which may relieve the party from any moral blame therefor, and it may well be that in order to save themselves from being carried out to sea the master and crew of the Blanche were justified in cutting adrift and abandoning the schooner; but abandonment of the enterprise, from whatever cause, forfeits every claim to salvage. Even if it should be held that libelants are not estopped by their contract, and that they did some service in the nature of salvage which entitled them to compensation, it would be difficult to find any principle upon which such claim can rest in a case like this; for the salvors here who picked up the vessel after she became derelict and brought her safely into port did not do so in co-operation with, or in furtherance of, the first undertaking. Theirs was an entirely new enterprise, undertaken after the first was entirely abandoned; for I must hold upon the proofs that the Blanche abandoned the Myrtle Tunnel because she was unable to handle her—she had not sufficient power. As will hereafter appear, the steam tug McCauley, of incomparably greater power, was unable alone successfully to accomplish it. It was not the velocity of the wind, which according to the weather reports was 16 miles an hour, and according to the testimony of St. George, the master of the Isabel, "not more than a 20-mile breeze," but the deficiency in power, which led the Blanche to cut her adrift; but, whatever may have been the cause, the enterprise was abandoned sine animo revertendi. The cases are numerous and clear that the right to compensation as co-salvor or joint salvor applies only where the efforts of the second salvors are in connection with, and continuation of, the efforts of the first salvors—where it is one and the same enterprise—and there is no such right where the first salvors have abandoned their efforts. The India, 1 W. Rob. 409; The Henry Ewbank, Fed. Cas. No. 6,376. The libel of the Blanche must therefore be dismissed.

As already stated, the schooner was turned adrift on the morning of March 17th. On the next day Capt. Avery, managing owner of the steam tug McCauley, of Savannah, having learned from passing steamers that there was a water-logged schooner in their path somewhere south of Frying Pan Shoals, left Savannah in the teeth of a severe Northeast gale, going up the coast in search of the schooner. The weather continuing severe, he went into the port of Georgetown Monday afternoon, remaining there until the storm abated, going out about daylight Wednesday morning, March 21st, to continue his search, and sighted the schooner at 4:30 Wednesday afternoon, March 21st, about 30 miles southeast of Frying Pan Light. She had drifted outside of the path of passing vessels, and nearer to the Gulf Stream. None of the passing steamers had undertaken to assist her. She was at a point on the south Atlantic coast where there are long barren stretches of shore and few harbors. The only haven south of Hatteras possible for her, with her 30 feet draft, was

Charleston, about 100 miles distant, at a season of the year when high winds prevail, invisible in the nighttime, and visible only at short range in the day, for her hull was submerged and all her sails gone, apparently a helpless waif upon the ocean, abandoned by her crew, and abandoned by those who had undertaken to save her at Wilmington, through the exhaustion of their resources. At the time she was found by Capt. Avery, the weather had become moderate, and he made fast to her, putting two of his men aboard, for although all of the midships of the schooner were under water, the stern and bow were a few feet out. He pulled on her until the next day, making some headway towards Charleston. On Thursday the revenue cutter Seminole came up and offered assistance, but it appears that he did not have a hawser sufficiently long to render any effectual aid, and as the weather at that time became threatening, and the schooner had been brought within the path of passing steamers, the master of the McCauley became despondent as to salving her, and, certain that he could not do so without assistance, which was not at hand, there was some talk of blowing her up; but as the Seminole had no explosives, nothing was done, so he took his men from the schooner, and proceeded towards Charleston to seek assistance. Meanwhile Capt. Igoe, master of the Protector, of Charleston, having received a message from the Seminole that the McCauley had found the schooner and needed assistance, after getting some extra men and an extra supply of coal, put to sea about 11 o'clock the night of March 22d. Failing to find the schooner, the weather being very heavy and raining, and it being impossible in those conditions to make a successful search, he put back to Charleston, arriving there about noon of March 24th, where he found the tug McCauley and the tug Paulsen, also of Savannah, belonging to the same owners, and after conference and necessary preparations the three tugs put to sea about 2 o'clock on the morning of March 25th, and about noon of that day they found the Myrtle Tunnel, which had drifted considerably since she had been left by the McCauley. It was a problem of no little difficulty to handle this schooner, water-logged and rudderless as she was, and required a high degree of skill and seamanship. She was towed by the Protector and the Paulsen stern foremost, the tug McCauley going astern and backing, and acting as a rudder, thus producing an equilibrium of forces, and was brought safely to this port. Not the least difficult or dangerous part of the undertaking was the steering her safely through the narrow channel, drawing, as she did, 30 feet of water, the greatest draft that has ever crossed the bar, and putting her upon a shoal where she could safely lie. It is unnecessary to give at greater length the details of these operations. Much praise is due to Capt. Avery and his associates for the enterprise, skill, and seamanship displayed, and for the modest and straightforward way in which it has been related. The schooner has been sold by order of court and by consent of all parties, and brought $18,000, and the cargo brought $6,000, and all that remains is to award suitable salvage remuneration.

Some question has been made as to whether the Myrtle Tunnel was a derelict. It appears in the testimony that the managing owner

notified the Insurance Company of North America, which company, it seems, had some interest in the schooner, and the tug North America, belonging to a company controlled by the insurance company, was sent down to look for the wrecked schooner. It does not appear from the testimony that she was employed by the schooner Myrtle Tunnel for that purpose, and the master of the tug North America says that "it was stated in a letter that the vessel would be found somewhere between Hatteras and Frying Pan and Lookout." It appears from this testimony that on March 23d he was "54 miles east of Frying Pan Shoals lightship. It was then dark, commencing to rain and storm. I could not see anything, and went into Lookout Bight. The wind blew 40 to 50 miles an hour." While at Lookout Bight he heard that the McCauley had found the schooner, and returned to Philadelphia. As he made search for the vessel at no point further south than on a line east of Frying Pan lightship, and looked for her only at points north of that line, and as the Myrtle Tunnel had never been north of that point, the North America would never have found her. That the master and crew of the Myrtle Tunnel abandoned her, sine animo revertendi, is not disputed. That there was a spes recuperandi on the part of the owners is probably not contested. No vessel was ever lost at sea without some hope lingering in the mind of the owners that she may be recovered. It is perhaps not important to determine whether or not the Myrtle Tunnel was technically a derelict. Mr. Justice Story defines a derelict as "a boat or vessel found deserted or abandoned on the seas, whether it arose from accident or necessity or voluntary dereliction." Another definition from high authority is this: "Derelicts are boats or other vessels forsaken or found on the seas without any person in them." Measured by this standard, the Myrtle Tunnel was a derelict. A temporary abandonment of a vessel for the purpose of providing more effectual means of saving it does not constitute a derelict, and so it cannot be held that the abandonment of the ship by the master and crew while she was lying on the shoals of Frying Pan, and her owners had made a contract for saving her, constituted her a derelict; but when those efforts failed, and she was turned adrift without a crew, without sails, and completely at the mercy of the winds and waves, she was to all intents and purposes a derelict.

In Rowe v. The Brig, Fed. Cas. No. 12,093, Judge Story says:

"There is no dispute in respect to the facts of this case, and upon these facts it is clearly a case of derelict in the sense of the maritime law, for to constitute a derelict in that law it is sufficient that the thing is found deserted or abandoned upon the seas, whether it arose from accident or necessity or voluntary dereliction. Sir Walter Scott has declared that a legal derelict is properly where there has been an abandonment at sea by the master and crew without hope of recovery. The Aquila, 1 C. Rob. Adm. 37. With the view for which the words 'without hope of recovery' are introduced, viz., to distinguish a temporary absence from a permanent abandonment, it might perhaps have been more accurate to have said, an abandonment without an intention to return, since the spes recuperandi might exist even though the abandonment were without such intention. Sir Leoline Jenkins has given a true definition in its most broad and accurate sense, when he says: 'Derelicts are boats or other vessels forsaken or found on the seas without any person in them.'"

In The Laura, 14 Wall. 336, 20 L. Ed. 813, the Supreme Court, citing the English and American cases, says:

"In the case of The Esperance, 1 Dod. 46, the claimants received a letter from the master, who, with the crew, had left the vessel, advising them of the fact, and immediately sent proper persons to take charge of her and her cargo, but before they arrived other salvors had taken the vessel, and finally brought her in and libeled her. Sir Walter Scott said it was a clear case of derelict. There was first the chance of the party sent by the claimants not finding her; and, secondly, that if found she would be a complete wreck."

In the case of The John Gilpin, Olcott, 78, Fed. Cas. No. 7,345, Judge Betts, in considering a question of derelict somewhat analogous, said that:

"She was apparently abandoned, and if her crew might have been absent to procure assistance from other vessels and more force, their ability to return to the wreck, or the chance of affording any aid after the lapse of a few hours, must, in the then condition of things, have been most dubious contingencies."

In The Coromandel, 1 Swab. 208, Dr. Lushington, in speaking of a case very similar to this, remarks:

"It may be perfectly true that the master and these fifteen men, when they had got on board the Young Frederick, and were sailing away to Yarmouth, intended, if possible, to employ steamers to go and rescue the vessel, which was at no great distance. But is not that the case every day? A master and crew abandon a vessel for the safety of their lives. He does not contemplate returning to use his own exertions, but the master hardly ever abandons a vessel on the coast without the intention, if he can obtain assistance, to save his vessel. That does not take away from the legal character of derelict."

In Rowe v. The Brig, above cited, Judge Story cites the rule as to the compensation most favored in derelict cases, and says that:

"It was the ancient rule of the admiralty to give the salvors a moiety of the property saved. This is very distinctly articulated in the Black Book of the admiralty as a known and settled rule of division, and it continued in practice at least to the close of the reign of Charles the 2d, for there is an express decree in 1683 recognizing its existence. The Aquila, 1 C. Rob. Adm. 37. I incline to believe that it was originally borrowed from the civil law, by analogy to the case of treasure found in some public place, in which case, by a decree of the Emperor Adrian, one moiety was given to the finder and one moiety to the public, which was precisely the mode of distribution in the admiralty where no owner appeared; for then one moiety was, under the grant of the crown, considered a droit of the admiralty. * * * At the argument I intimated an opinion that in cases of derelict the old rule ought still to be considered as a subsisting but flexible rule, and that prima facie the salvors were entitled to a moiety, and that it was incumbent upon the claimant to establish that, under the special circumstances of the case, a different measure ought to be applied; and the opinion was given with reference to the fact that a moiety still continues the favorite proportion of judicial tribunals, if we can trust to the accuracy of reports. Upon subsequent reflection, I feel not the slightest inclination to change that opinion, and, as a limit upon judicial discretion in ordinary cases, I think it a safe and salutary rule. When I say, however, that the rule is flexible, I do not mean that it bends to every slight change of circumstance, but cases may occur of such extraordinary peril and difficulty, of such exalted virtue and enterprise, that a moiety even of a very valuable property might be too small a proportion."

In the later case of The Henry Ewbank, Fed. Cas. No. 6,376, Judge Story says;

"The District Court allowed, as we have seen, one moiety. The insurance company have acquiesced in this allowance, and so have the owners, officers, and crew of the Hope. The amount is contested by the other parties appellant, who ask for an increase of salvage, asserting that it is not sufficient to compensate them for their labors, or in proportion to the merits of the salvage service. At the argument I intimated a strong inclination to change the amount of salvage, and upon the most mature reflection I adhere to that opinion. This is a clear case of derelict, for there was an abandonment of the property animo non revertendi. In such cases the habit of courts of admiralty has been to decree one moiety to the salvors, and by the old law no more than that was ever decreed. That rule, however, has been somewhat relaxed in modern times, but still a moiety continues to be the favored, if not favorite, proportion allowed by courts of admiralty in ordinary cases. * * * It is not, however, an inflexible rule, but it yields to extraordinary circumstances, greatly diminishing or enhancing the perils and gallantry and personal sacrifices of the salvage service. But the court on all occasions has great reluctance in deviating from a moiety, and expects a very strong case to be made out, in which, upon other principles, there would be a very great disproportion between the services and the compensation, so great, indeed, as in a moral and legal view to constrain the court to deviate from it. And there is great wisdom in thus adhering to the rule, for nothing can be more inconvenient in the administration of justice, and especially of international justice, ex æquo et bono, than to leave every case open to the mere exercise of an unlimited discretion. Certainty in this case, as in many other cases, is far more important than mere theoretical propriety. * * * Treated as a mere question of compensation for labor and services, measured by any common standard on land or at sea, the salvage of one moiety is far too high. But, treated as it should be, as a mixed question of public policy and private right, equally important to all commercial nations, and equally encouraged by all, a moiety is no more than may justly be awarded."

In Post v. Jones, 19 How. 161, 15 L. Ed. 618, the Supreme Court of the United States says:

"The case before us is properly one of derelict. In such cases it has frequently been asserted as a general rule that the compensation should not be more than one-half nor less than one-third of the property saved. But we agree with Dr. Lushington (The Florence, 20 E. L. & C. R. 622), that the reward in derelict cases should be governed by the same principle as other salvage cases, viz., danger to property, value, risk of life, skill, labor, and the duration of the service, and that no valid reason can be assigned for fixing a reward for salving derelict property at a moiety or any given proportion, and that the true principle is, adequate reward according to the circumstances of the case."

Since that opinion was delivered in 1856 there have been numerous cases in our courts. In The Agnes Manning (D. C.) 59 Fed. 481, the value of the property salved was $29,000. A moiety was awarded. In The Theta (D. C.) 135 Fed. 129, decided in 1905, a steamship bound from Norfolk to Boston, of the value of about $275,000, picked up off the coast of Delaware a lumber laden schooner, which had been seriously injured in a collision, and abandoned by her crew, and towed her to the port of New York. The schooner's main deck was under water, and with strong winds the towing was slow and difficult, requiring two and one-half days and considerable expense. The schooner and cargo was of the value of about $10,000. One-half was allowed as salvage.

The salvage services in this case were most meretorious; they were rendered promptly, efficiently, and skillfully, and in removing this

dangerous wreck from the pathway of commerce the salvors have performed a great public service. Authority can be found for awarding more than a moiety in extraordinary circumstances, where great danger has been encountered and great heroism displayed, and where one-half of the amount saved is an inadequate reward. While the services in this case were not unattended by certain perils, the danger was not so great nor the circumstances so extraordinary, nor is the amount to be awarded so small, as to justify a departure from the ancient rule, which is to award a moiety; for, as is admirably said by Mr. Justice Story in the case already cited:

"There is great wisdom in adhering to the rule, for nothing can be more inconvenient in the administration of justice, and especially of international justice, ex æquo et bono, than to leave every case open to the mere exercise of an unlimited discretion."

Although the rule is somewhat flexible, and may be bent by extraordinary circumstances, it is a safe and salutary limit upon judicial discretion, and not to be lightly disregarded. A court, moved by admiration for the skill and courage of salvors, and desiring to reward their services with a liberal hand, cannot in justice shut its eyes upon the rights of the claimants, who by unmerited and unremediable misfortune have already suffered such heavy losses, and should not by its decree deprive them of the small remnant that the sea has spared.

Let a decree be entered for the payment of the costs and expenses, and dividing the remainder between the claimants and the libelants— one moiety to each.

If necessary, a reference may be had to properly apportion the award among those entitled to salvage, and to fix the amount properly chargeable as expenses.