## THE FLORA RODGERS.

## THE J. W. BELANO.

(District Court, D. South Carolina. March 2, 1907.)

1. SALAVGE—AMOUNT OF COMPENSATION—DERELICTS.

The amount to be awarded to a salvor is in all cases left to the discretion of the court, but that is not an unlimited discretion, being governed by principle and precedent. The rule that one-half should be awarded for the salvage of a derelict while not inflexible should not be departed from except under extraordinary circumstances.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 69.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

2. SAME.

The doctrine of compensation as upon a quantum meruit has little application in the maritime law of salvage.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 55.]

3. SAME.

An Italian steamship worth with her cargo $233,000, while proceeding from Genoa via Baltimore to New Orleans, when some distance southwesterly of Cape Lookout lightship, and after a severe storm, discovered, one after the other, two schooners dismasted and abandoned. These were both taken in tow and towed to Charleston, 220 miles distant, which was the nearest port of which the master had a chart. The steamship was delayed by reason of the service something over 60 hours. The weather was good, and the towing, while requiring care and skill and constant attention day and night, owing to the disabled condition of the schooners, was not attended by any great risk except from the parting of the hawsers, by which the first mate was killed. The two vessels with their cargoes were of the value of $14,000. *Held*, that the usual rule in relation to the salvage of derelicts would be followed, and the ship awarded one-half the value saved, in addition to the expenses and losses incurred in the service.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 69.]

In Admiralty. Suits to recover salvage.

Mitchell & Smith, for libelant.

Nathans & Sinkler, for respondents.

BRAWLEY, District Judge. A storm of unusual severity occurred on the South Atlantic coast September 17, 1906, causing great damage

to shipping, and on the morning of Wednesday, September 19th, the Italian steamship Fert, an iron steamer of 2,629 net tons, 340 feet long, 46 feet beam, 1883 horse power, of the value of about $200,000, laden with a cargo of the value of about $33,000, while proceeding on a voyage from Geona, via the port of Baltimore to New Orleans, sighted a vessel about 35 miles southwesterly of Cape Lookout lightship, about longitude 77 and latitude 34, and bearing down on her, sent a boat's crew aboard in charge of the first officer, found the vessel to be the schooner Flora Rodgers, dismasted, abandoned, and with no one on board. She was lying in the path of all coastwise navigation, and a great menace thereto, and in a position of great danger of drifting on Lookout or Frying Pan Shoals, or getting into the gulf stream and being irretrievably lost. The Fert made fast to her with two sisal hawsers of 14 inches in circumference, and about 11:30 proceeded on her way towards the port of Charleston. As there was some criticism of the master, Giannoni, for not making the port of Wilmington, the nearest port to the derelict, or the port of Georgetown, which was nearer than that of Charleston, it may be as well to say that the testimony of Giannoni was that he had no charts of the ports named, and that he did have a chart of the port of Charleston. As the Fert is a foreign ship, it cannot be imputed to her master as a fault that he did not proceed to the nearest port, and for reasons not necessary to be detailed Charleston seems to have been in the circumstances the nearest and most practicable port. Soon after getting under the way he sighted another object on the horizon, five or six miles inshore of his course and heading for the same found it to be the J. W. Belano, another schooner, lumber laden and dismasted, with the wreckage of her masts and bowsprit floating around her, and her cabin and forecastle full of water. Finding no one aboard, he determined also to take this vessel in tow, and sent a boat's crew aboard of her and fastened a wire hawser 4¼ inches in circumference to the port anchor chain of the Belano, so as to give some play to the steel hawser. In this operation the long boat of the Fert was crushed. He then proceeded, towing the Belano behind the Rodgers on the port side of the Fert, and the Rodgers on the starboard side. The steering gear of the schooners were not in good order, and with the vessels yawing and crossing, it required considerable care and skill to tow them safely to port. One of the sisal hawsers attached to the Rodgers parted twice, and the other once, necessitating the stopping and manœuvering of the steamship to avoid the two tows getting into collision, and the sending of new hawsers aboard, with the consequent trouble and risk. After the sisal ropes were used up a manila rope 9½ inches in circumference was made fast to the Rodgers. On the next day the wire cable used for towing the Belano parted and a second steel hawser was gotten out and made fast. The parting of the steel hawser on the Belano, owing to the breaking of the bit and the hawser swinging out of the chock, caused the death of the first mate, Dipino, who was overseeing this work; his leg having been completely cut off at the thigh. They finally came off Charleston lightship, about 9 o'clock Friday evening, September 21st, where the two vessels were anchored, and they were brought into Charleston the next day by the tug Protector.

The steamship was actively engaged in this salvage service from 8 a. m. September 19th, until 9 p. m. September 21st. The distance was about 220 miles. The course of the steamship Fert going to New. Orleans would have ordinarily been about 60 miles off Charleston lightship, and would have taken about 18 or 20 hours, so the actual delay of the steamship on her voyage in reaching her destination was something over 60 hours. The value of the Flora Rodgers was $1,400, and of her cargo $2,125. The value of the J. W. Belano was $7,550, and of her cargo $3,000. There was no stress of weather during the operations described, but the duties demanded of the officers and crew of the Fert were extremely onerous and exacting. The testimony shows that neither officers or crew went to bed during the whole time engaged in the service, getting only snatches of sleep. No testimony was offered by either of the claimants as to the circumstances attending their abandonment by their respective crews. The case is clearly one of derelict, and the only question is as to the amount of salvage.

This court has lately, in the Myrtle Tunnel, 146 Fed. 324, stated the rule which, as the result of all the cases, seems to govern, and it has more recently examined all the cases cited in the note to the Lamington, 86 Fed. 685, 30 C. C. A. 281. The rule is to award one-half. More than that is given in extraordinary circumstances, where the service has been attended by great peril, and where the amount saved is so small that one-half is inadequate, and less than a moiety is given where the amount salved is very large and the services have been unattended by any circumstances of unusual danger or exertion. A moiety is the rule, and as Justice Story said in one of the cases cited:

"There is great wisdom in adhering to the rule and not to leave every case to mere exercise of unlimited discretion."

In the Myrtle Tunnel, supra, the value of the ship and cargo saved was $24,000, and one-half of it was awarded to the salvors. The services were unusually meritorious and rendered by steamtugs especially equipped for salvage operations, and in the line of their business. In this case, as the weather was good, there was no particular danger encountered, and the derelicts were picked up by the steamship while on her regular way; but there is always some danger attending the towing by a steamship of derelict vessels of having her propeller put out of order, and her machinery injured. These derelicts are a great menace to navigation, and it is a meritorious act in any steamship to remove them, and calls for commendation, and in all suitable cases for reward.

It is within the experience of this court that the regular coastwise steamships are reluctant to take hold of derelicts found in their path, and to bring them into port. It is a service always attended with inconvenience and delay and sometimes with risk to themselves, and the usual course is to pass them by and report them on arrival, leaving the task of removal either to the government, or to the adventurous speculation of private parties equipped for such service. This was the case with the Myrtle Tunnel, where the proofs showed that she was reported by several steamships, who passed by without going to her rescue. Meanwhile such derelicts, lying in the pathway of navigation,

are a serious danger to it, especially at night, when the absence of lights render them invisible. Courts therefore should and generally do recognize this as a proper element to be considered in making awards on grounds of public policy, and to encourage others to undertake like services. It may sometimes happen that the value of the vessel saved is so inconsiderable that the whole might not be proper compensation for the exertion and risk, if estimated upon the principle of a quantum meruit, but salvage does not rest upon the theory of compensation pro opere et labore. The service must be of some benefit to the owner of the property salved, and however much the interest of the public may require salvage services to be encouraged, the property is salved for him and not for the public, and his interest cannot be wholly excluded from consideration. So far as he is concerned, it might as well be lost entirely if the salvor is to get the whole. The salvor in all cases takes his chances, however meritorious his exertions, or great the hazard encountered, if he saves nothing, he has no claim against the owner as for services rendered; but courts cannot lose sight of the fact that the property saved is saved for the owner, and he is entitled to his fair share.

What shall be awarded to the salvor is in all cases left to the discretion of the court; but that is not an unlimited discretion. It is governed by principle and precedent. An almost unbroken line of cases shows that the rule is to award one-half. The rule is not inflexible, but it should not be swayed by slight circumstances, and there are no extraordinary circumstances here which seem to require a departure from a rule so well established that it has almost the effect of binding authority. On the part of libelant the court is asked to award more than a moiety in view of the small value of the property salved. On the part of the claimants, it is insisted that, in view of the small risk encountered and of other circumstances, less than a moiety would be fair compensation. The cases have been heard together, but separate decrees must be entered, as the claimants are not the same. If the Flora Rodgers stood alone it might be fairly argued that one-half of the small amount salved would be inadequate compensation, as with equal fairness it could be claimed that one-half of the larger amount derived from the Belano is more than adequate for the services rendered; but the doctrine of compensation as upon a quantum meruit has little application in the maritime law of salvage. The salvor takes all the risks. If by misfortune he fails to bring the derelict to a port of safety he gets nothing, however meritorious or laborious his service.

In the absence of extraordinary circumstances requiring a departure from the well-settled rule, it seems better to adhere to it, and a decree will therefore be entered in each case awarding one moiety to the libelant, after deducting the expenses. Among the expenses to be allowed are the pilotage bills, one-half of the extra coal consumed to be charged to each, the value of the hawsers lost or impaired on the respective vessels as proved, one-half of the bills of the Protector for services in the harbor, to be charged to each, and the customary charge for towage in bringing the vessels into port, to be charged to them, respectively; there being nothing in the testimony to differentiate this service from the ordinary case of towage.