## THE SHAWMUT.

### THE MYRTLE TUNNEL.

(District Court, D. South Carolina. July 9, 1907.)

**1. SALVAGE—BASIS OF COMPENSATION—QUASI DERELICT.**

Prima facie a vessel found at sea in a situation of peril, with no one on board, is a derelict; but, where the master and crew have left temporarily for the purpose of obtaining assistance, and with intent to return and resume possession, she is not technically a derelict, although another vessel finding her in such condition and rescuing her is entitled to salvage compensation as in case of a derelict.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 7, 8.]

**2. SAME—SCHOONER TEMPORARILY ABANDONED AT SEA—SALVAGE AWARD.**

The schooner Myrtle Tunnel, laden with cross-ties, was disabled by a hurricane off the Florida coast, and, a passing steamer being unable to tow her, the master and crew took passage on such steamer to Charleston to procure assistance. The master proceeded to Savannah, where her owners resided, who hired two ocean-going tugs to go in search of the schooner. Three days later the steamer Shawmut, on a voyage from Jacksonville to Philadelphia, finding the schooner abandoned and waterlogged, took her in tow and proceeded with her to Jacksonville, which was the nearest port, and some 60 to 75 miles distant. Owing to her being so deep in the water, she could not be taken over the St. John's Bar, and the master of the Shawmut, after a delay of a day and a half, by direction of his owners, took her to Charleston. One of the tugs sent out to search for her came up with the Shawmut and her tow before they reached the bar, and demanded that the schooner be surrendered to her, and also that she be taken to Charleston, advising the master of the Shawmut that she could not cross the St. John's Bar. The other tug joined them at the bar, and both accompanied the Shawmut and tow to Charleston. The value of the schooner and cargo was $38,500. *Held* that, under the rule that a salvor is bound to the exercise of ordinary care only, the Shawmut was not chargeable with fault which deprived her of the right to salvage or lessened the amount to which she was entitled, because she proceeded to the bar and stayed there until the master could communicate with her owner's agent at Jacksonville, or because of his refusal of the assistance of the tugs, or the use of an alleged defective hawser on the towage to Charleston, which proved sufficient, but that she would not be allowed for the hire of two tugs engaged to take the schooner into the harbor at Charleston, the two tugs under hire from the owners being present, and having tendered their services; that under the circumstances, and in view of the efforts being made by the owners to regain the schooner, which would probably have been successful, the Shawmut was entitled to an award equal to one-third the value of the vessel and cargo.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, § 69.

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage.
See 146 Fed. 324.

Miller & Whaley, for libelants.
Bryan & Bryan, for respondents.

BRAWLEY, District Judge. The four-masted schooner Myrtle Tunnel, of which the Paulsen Company of Savannah, Ga., is managing owner, sailed from Brunswick laden with cross-ties, bound for New York, March 31, 1907, and one day out was struck by a hurricane, her sails torn away, her forward house amidships stove in, waterways on port side and her deck load carried away, and was badly leaking. On April 3d her master requested towage by the steamship Mae to the port of Charleston; but said steamship, because of her own damaged condition and lack of coal, was unable to tow the schooner, and at 1:30 p. m. April 3d took off the master and crew, who arrived at the port of Charleston on the night of April 4th. The master forthwith communicated by telegraph with her owners at Savannah, and took the next train to that place. The owners hired the ocean-going steam tugs Jacob Paulsen and the Cynthia to go in search of her; the former leaving on the same day, as soon as she could coal, and the latter on the second day thereafter, when she was free from prior engagements, and the master of the Myrtle Tunnel going on the Cynthia, of which Capt. Avery, a skillful and experienced navigator, was master. The Myrtle Tunnel had been abandoned at a point about 53 miles E. by S. from St. Augustine, Fla., in longitude 80° 16'; latitude 29° 40'. On the night of April 7th, the steamship Shawmut, owned by the libelants, of the value of $100,000, with a cargo valued at $20,000, while on her regular route as a freight-carrying steamship, from Jacksonville, Fla., to Philadelphia, sighted the Myrtle Tunnel, and lying by her until the next morning, and finding that she was abandoned and water-logged, took the schooner in tow, and started to return to Jacksonville. There was a slight discrepancy in the testimony as to the point at which the schooner was picked up; the libel stating it as being about 60 miles from St. John's Bar, and there is testimony that the master of the Shawmut told Capt. Brown that she was picked up at a point about 75 miles from the St. John's Bar and about 90 miles from Charleston. The schooner was carried to the St. John's Bar, arriving on the afternoon of April 8th, where she remained until Wednesday morning, April 10th, on account of her inability, by reason of her depth of draft, to enter the St. John's river. She was carried to Charleston and anchored inside of the harbor on the afternoon of April 11th. The steam tug Paulsen, which had been cruising in search of the Myrtle Tunnel, came up with the Shawmut having her in tow on Monday afternoon. Brown, the master of the Paulsen, states the time at 12:30, and Hansen, the master of the Shawmut, states the time at 2:15; Brown testifying that she was 26 to 30 miles from St. John's Bar, and Hansen testifying that she was about 18 miles. Brown testifies that he informed the master of the Shawmut that the tugs Paulsen and Cynthia had been sent by the owners in search of the Myrtle Tunnel, that her draft was such that she could not enter the St. John's river, and that he had papers aboard which would satisfy the master of the Shawmut of these

facts, and demanded that the schooner be taken to Charleston, and the answer states that he required the steamship Shawmut to turn over the schooner to said tugs to tow her forthwith to Charleston. The tug Cynthia, Avery, master, arrived at the St. John's Bar Monday afternoon, shortly after the arrival there of the Shawmut, with her tow. Avery has described in detail his cruise in search of the Myrtle Tunnel and his plan of operation. He is an uncommonly skillful navigator, and there is little doubt that, according to the plan mapped out and followed by him, he would have discovered the Myrtle Tunnel within a relatively short time after she was actually found by the Shawmut.

This court has recently been called upon to consider many of the questions involved here. (The Myrtle Tunnel, 146 Fed. 324; The Flora Rodgers and The J. W. Belano, 152 Fed. 286), and has reviewed most of the cases involving salvage awards. It is unnecessary therefore to state the law with much elaboration.

The first question that arises is whether the Myrtle Tunnel is a derelict. Prima facie a vessel found at sea in a situation of peril, with no one aboard of her, is a derelict; but where the master and crew leave such vessel temporarily, without any intention of final abandonment, for the purpose of obtaining assistance, and with the intent to return and resume possession, she is not technically a derelict. It is not of substantial importance to decide that question. She was what may be called a quasi derelict; abandoned, helpless, her sails gone, entirely without power in herself to save herself from a situation not of imminent, but of considerable, peril; lying about midway between the Gulf Stream and the shore, and about 30 miles from either. An east wind would have driven her upon one, and a west wind into the other, where she would have become a total loss. Lying in the pathway of commerce, with nothing aboard to indicate an intention to return and resume possession, it was a highly meritorious act upon the part of the Shawmut to take possession of her, and the award must be governed by the rules which govern in case of derelicts; the amount of it to be modified in some degree in the interest of the owners in consideration of their prompt, intelligent, and praiseworthy efforts to resume possession of her, wherein they incurred considerable expense. The contention of the claimants in the main is that this award has been forfeited or greatly diminished by the negligence and misconduct of the libelants.

Stripped of the vituperative epithets in which it has been articulated, the charge is:

First. That the Myrtle Tunnel should have been taken immediately to Charleston, that being the only safe port, owing to her draft; that in taking her to Jacksonville, where the depth of water is only 23 feet, she drawing over 28 feet, the schooner was exposed to unnecessary peril. It cannot be disputed that it is the duty of salvors to take the salved vessel to the nearest safe port, and that, of course, means a port into which she can be safely carried. There was no outward or visible indication on the Myrtle Tunnel of her depth of draft. There was a sounding well, from which it could have been approximated by allowance for the skin of the ship and her depth of keel, which were, of course, unknown and unknowable quantities, and a very high de-

gree of intelligence and skill would have suggested some effort to find out her draft; but she was water-logged, the waves washing over her at midships, and when it is considered that lumber-carrying vessels as a rule do not draw as much water as was proved to be the case here, that the master of the Shawmut was acquainted with the port of Jacksonville, and his owners had an agent there, and that he had no personal acquaintance with the port of Charleston, although the Atlantic Coast Pilot, a copy of which he had in his possession, would have given him the necessary information as to the depth of water on the bar at Charleston, it cannot be imputed to him as a culpable fault that he endeavored to make that port, which was nearer in distance. The first officer, who was aboard the Myrtle Tunnel, estimated her draft at 25 feet. If such had been the case, she could by pumping out have been enabled to cross the St. John's Bar. After the tug Paulsen, however, came up with him early in the afternoon and gave him positive information as to the schooner's depth of draft, it was obvious that she could not cross St. John's Bar, and futile to attempt to take her to Jacksonville. It then became his duty to take her to Charleston, where alone she could find safe anchorage, and he would not have been absolved from responsibility for any damage had any accrued by delay or otherwise. The information communicated to him by the master of the Paulsen was accompanied by a demand that the schooner be turned over to him and to his consort the Cynthia, and as the master of the Shawmut was presumably not well informed as to his legal rights, it was not unnatural that he should desire to communicate with his owners, and, as he testifies that he was then only 18 miles from the St. John's Bar, the court does not acquiesce in the contention of the claimant that there was gross and culpable misconduct in proceeding on his way. A high degree of care and prudence would have suggested that he proceed to Charleston, where eventually he was compelled to go; but the rule of diligence obligatory upon salvors is that of ordinary care. The law does not and should not scrutinize too narrowly a service begun with meritorious motive to save property exposed to destruction, and so long as the salvor acts in good faith and exercises that skill and care which a man of ordinary prudence and capacity would be expected to use in the preservation of his own property, his claim for remuneration ought not to be defeated by showing that a greater degree of skill might have avoided any possible peril. Every hour's delay in removing a disabled vessel from the perils of the open sea to a safe anchorage should be avoided; but the salvor in this case had an interest in the salved vessel jointly with the owner, and his conduct, measured by that standard, which requires the same skill as is demanded for the preservation of one's own property, while it may not be free from criticism, seems to be free from that degree of censurable fault which should deprive him of the remuneration to which he is otherwise entitled. The imputation of improper motive in desiring thereby to enhance his reward does not seem to be sustained.

The second fault imputed is in remaining at the St. John's Bar from Monday evening until Wednesday morning, when he started for Charleston. It is some distance from the mouth of the bar to Jacksonville, where the master could communicate with the agent, and it

was not until Tuesday evening that the agent, who had to communicate with the owners in Philadelphia, gave him his instructions. While the court does not approve of such tardiness, it cannot characterize it as grossly culpable.

The third charge is in rejecting offers of assistance from the tugs Cynthia and Paulsen, in not employing them to pump out the Myrtle Tunnel, and in the Shawmut proceeding to tow the schooner with an imperfect hawser. The master of the Shawmut had sent his engineer and others aboard the schooner while at the St. John's Bar to pump her out; but it was found that the pumps were not in working order, and after he determined to go to Charleston it does not seem to have been necessary to have pumped her out or to have called upon the tugs for that purpose, and nothing was done. Early on Tuesday morning, in a sudden squall, the hawser parted near the bits, and the schooner was carried out to sea, where the Shawmut proceeded to retake her. Every effort seems to have been made in Jacksonville to procure a new hawser, but none was obtainable. The agent of the steamship tried to buy a hawser from Capt. Avery of the Cynthia, who refused to sell it, saying that he would not furnish him tools to work with, but that he was willing to aid in every way possible, and to assist in towing, and so forth. The steamship's agent has testified that, in a conversation with Capt. Avery, the latter proffered assistance as a co-salvor, and there seems to have been at different times during the period covered by the service a misconception on both sides of the respective rights and obligations of salvor and owner; but the exigencies of the case do not seem to render it necessary to state the law on that point with any fullness. That the owner has the right to offer assistance in salving his property could scarcely be disputed; nor can it be questioned that it is the duty of the salvor to accept such assistance if he needs it. The only disputed point is whether the salvor needed the assistance of the two tugs. That the Shawmut ought not to have undertaken to tow the schooner with a damaged hawser, if he would thereby endanger her safety, if he could procure a sound one, is not open to doubt. There is no direct testimony as to the condition of the hawser, except that it parted on the night of the squall. If it parted by reason of the chafing, and it remained sufficiently long and sufficiently strong to answer the purpose of towing the vessel to Charleston, there does not seem to be any ground to impute culpable negligence in so using it, and the event proved that this was the case. The testimony of Capt. Avery was that he did not at that time consider it an act of grave imprudence on the part of the Shawmut to make the attempt, especially in view of the fact that the two tugs accompanied the Shawmut and the schooner as a convoy, and were at hand to render assistance if any was needed, and so avowed their intention, and, as already stated, the hawser turned out to be amply sufficient for the purpose, and the vessel was brought safely to Charleston.

Fourth. The next ground of complaint is that on arrival at the bar of Charleston the agent of the steamship hired two tugs, at a cost of $500, to bring the schooner into the harbor. The tugs Paulsen and Cynthia had been hired by the owners at the expense of $150 a day each to search for their vessel. They were at the St. John's Bar, and

offered to assist, if needed. The Shawmut did not need their service in towing, as she had sufficient power for that purpose, and, as it turned out, did not absolutely need the hawser; but on arrival at the bar of Charleston tugs were needed to bring the schooner into port. The tugs Cynthia and Paulsen were there. They had left St. John's Bar in company with the Shawmut, and had been in sight of her all the way. The master of the Shawmut and the agent of the steamship, who came to Charleston, well knew that the tugs were there, willing and able to do the service desired. They rejected this service and subjected the owners to the wholly unnecessary expense of hiring other tugs. This was inexcusable, and was done under the mistaken assumption that the Cynthia and Paulsen might claim to be co-salvors, and the award to the Shawmut thereby diminished. Even if such claim on the part of the tugs had been well founded, the amount to be allowed them would have been passed upon by the courts, and it is not to be lightly presumed that any court would give its sanction to any extravagant pretentions for such a service. This specification of fault in the salvor is sustained. The extent of it is easily measured. It amounts to $500, the sum paid for the tugs, which will not be allowed as costs.

As the court has no doubt that this is a meritorious case of salvage successfully accomplished, it only remains to fix the amount of the award. The Supreme Court, in Post v. Jones, 19 How. 150, 15 L. Ed. 618, says that the true principle is adequate reward according to the circumstances of the case. This court has hitherto in cases of derelicts adhered to the ancient rule of awarding a moiety, with great confidence in its wisdom, as affording some guide to and limit upon judicial discretion. This rule has never been regarded as inflexible, and it must bend to circumstances. Two opposing considerations are always operative upon the conscience and judgment in this class of cases. The one is the consideration of public policy, which leads to the giving of a bounty sufficiently liberal to induce vessels to undertake the labor and to incur the hazards of towing floating wrecks and removing them out of the pathway of commerce, where they are a menace to life and property, lying like hidden and uncharted rocks. It is within the experience of the court that the regular lines of passenger steamships plying up and down this coast are reluctant to undertake this service, and some substantial reward is required to stimulate it. The other consideration is that for the owner, who has been led by providential calamity to abandon his property for the time being. The value of the property salved, the danger to it, the risk of life, the skill, labor, and the duration of service are all elements which have to be considered. The court has fixed the value of the schooner in this case at $33,000, and the value of the cargo at $5,500. There was no risk of life, no especial skill, or extraordinary labor. The danger to the schooner as she lay when taken by the libelant was not so great as is usual in derelict cases, for the owners at considerable expense, and with great promptitude, had employed ocean-going tugs, under the command of skillful men, to cruise in search of her, and there was reasonable probability that they would have found her soon after she was taken in tow by the Shawmut.

155 F.—31

·It seems, therefore, ·that an award of one-third would be ·proper in the circumstances detailed, and a decree for such amount will be entered, which will carry all the costs incurred, except for the hiring of the tugs at Charleston, referred to above.