Paul W. REISS, Brian Hanson, Pamela Evans, and James Atkins, Plaintiffs,

v.

ONE SCHAT–HARDING LIFEBOAT NO. 120776 # 1, Her Engines, Electronics, Appurtenances, Tackle, Apparel, Etc., in rem, Defendant.

C.A. No. 2:04–22379–PMD.

United States District Court, D. South Carolina, Charleston Division.

May 30, 2006.

Edward Paul Gibson, Riesen Law Offices, Charleston, SC, for Plaintiffs.

Julius H. Hines, Buist Moore Smythe and McGee, Charleston, SC, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DUFFY, District Judge.

This matter was tried without a jury on May 17, 2006. The court—having heard the arguments, read the briefs of counsel, and considered the evidence including testimony of live witnesses, deposition testi-

mony, and exhibits—makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

1. Plaintiff Paul W. Reiss is a citizen and resident of Florida. He is the owner and captain of the BOLD VENTURE, a fiberglass fishing trawler.

2. Brian Hanson, Pamela Evans, and James Atkins are residents of Charleston County, South Carolina. As of the events at issue in this case, they were the first mate, second mate and third mate of the BOLD VENTURE.

3. The BOLD VENTURE fishes off the coasts of the South Carolina and Florida, depending on the season. As of the events at issue in this case, the BOLD VENTURE was fishing out of Cherry Point on Wadmalaw Island, South Carolina.

4. SKS OBO Holding, Ltd. ("SKS OBO") is a Bermudian company. SKS OBO is the owner of the 800–foot Norwegian-flagged combination bulk/tanker vessel "SKS TORRENS." The TORRENS is managed by V. Ships Norway A.S. ("V.Ships"). V. Ships manages about 45 vessels including the TORRENS.

5. As of its acquisition by SKS OBO, the TORRENS was equipped with a type FF800 free-fall survival craft, boat number 120 776 # 1 ("the Lifeboat"), manufactured in June of 1998 by Umoe Schat–Harding AS ("Schat–Harding"). The Lifeboat is 10.2 meters in length and 2.49 meters in breadth, with a total enclosed volume of 41.01 cubic meters. It is rated for 30 persons.

6. A free-fall lifeboat, as opposed to a conventional lifeboat, is mounted on an ejector rack instead of davits. When launched, it slides out of its ejector rack into the water. The ejector rack is specific to the type FF800 and will not fit any other model of vessel.

7. The TORRENS was en route from Houston, Texas, to Norfolk, Virginia, in September of 2004, when the Lifeboat accidentally came free of its ejector rack during a night of rough weather off the coast of the Southeastern United States. The crew of the TORRENS discovered the missing Lifeboat the morning of September 22, 2004.

8. The TORRENS was permitted to enter the Port of Norfolk without the Lifeboat. V. Ships Norway immediately began searching for a replacement lifeboat. In the interim, it arranged for life rafts to be delivered to the vessel at the port of Norfolk, Virginia so that there would be no delay in the vessel's scheduled departure from Norfolk. The classification society would allow the vessel to be operated for three or four months with life rafts instead of a lifeboat. V. Ships' purchasing manager Bjorn Spenningsby had decided to purchase a new lifeboat from Schat–Harding on or about September 22, 2004 for 775,000 Norwegian Kroner.

9. On September 21, 2004, Plaintiffs began fishing Trip 04–10 sailing from Cherry Point Seafood on Wadmalaw Island, South Carolina aboard the BOLD VENTURE, which was fully provisioned with fuel, ice and bait for a twelve day fishing trip. On September 22, 2004, the BOLD VENTURE commenced fishing operations for wreckfish.

10. On September 24, day three of the twelve day trip, the winds were approximately twenty to twenty-five knots, the seas had a five to seven foot swell with a three foot wind chop on top of it. The skies were clear with a visibility of three to five miles.

11. At approximately 1600 hours on September 24, Captain Reiss spotted the Defendant lifeboat in the water. At that time, Plaintiffs halted fishing operations, drew in their fishing equipment, and got

underway with the intent of intercepting the vessel several miles away.

12. Upon reaching the vessel, Plaintiffs backed the BOLD VENTURE against the Lifeboat on the leeward side and waited for a lull in the weather. About an hour later, when the water was calmer, Mate Hanson leapt aboard the Lifeboat onto its forward railing. After determining that there were no people aboard the Lifeboat, Plaintiffs began preparing to tow her in.

13. Captain Reiss devised a method to take the vessel under tow. He and his crew fixed one end of an anchor line to a pad eye on the bow of the Lifeboat, and the other to a chain "bridle" across the stern of the BOLD VENTURE. They proceeded to tow the Lifeboat in to Cherry Point, arriving on the morning of September 25, 2004.

14. The Plaintiffs ensured that the lifeboat was delivered in sound condition and safeguarded the boat and its contents. Once docked, Captain Reiss boarded the lifeboat and determined it to be in good working order save for the EPIRB which had come loose from its cradle and broken apart. Captain Reiss found a list of the following equipment aboard the lifeboat: food packs, SOLAS flare kits, fishing equipment, flashlights, knives, and miscellaneous survival equipment.

15. After taking the Lifeboat in tow, Captain Reiss contacted the U.S. Coast Guard and provided the name of the TORRENS. On September 25, 2004, Reiss was contacted by the TORRENS' master, who was understandably eager for the return of the Lifeboat to the TORRENS in Norfolk. Captain Reiss assisted in the safe return of the lifeboat to the SKS TORRENS to prevent any delay of her voyage.

## CONCLUSIONS OF LAW

1. This is a salvage action brought within the Admiralty jurisdiction of this Court.

2. Salvage is defined as an action involving one-a salvor-who voluntarily saves life or property at sea. *R.M.S. Titanic, Inc. v. Wrecked and Abandoned Vessel,* 286 F.3d 194, 202 (4th Cir.2002) (citing generally Martin J. Norris, 3A *Benedict on Admiralty* §§ 5–13 (7th ed.1998)). In a typical salvage case, a seaworthy vessel renders assistance to another vessel that has become disabled, but has not yet sunk. *Columbus–America Discovery Group v. Atlantic Mut. Ins. Co.,* 56 F.3d 556, 570 (4th Cir.1995).

3. Under the law of salvage, the original owners of the salved vessel still retain ownership rights to such property. *Columbus–America Discovery Group,* 974 F.2d at 459 (4th Cir.1992). The salvor, however, obtains a lien on the property, not title to it. *R.M.S. Titanic, Inc.,* 286 F.3d at 204–205; *see, e.g., The Akaba,* 54 F. 197, 200 (4th Cir.1893) ("When articles are lost at sea the title of the owner in them remains.").

4. Because of the dangers of the sea and the mutual interest of seamen to traverse the sea notwithstanding its dangers, the law of admiralty for almost 3,000 years has uniformly held that those who voluntarily come to the assistance of fellow seamen in distress and perform salvage are entitled to be rewarded. *R.M.S. Titanic, Inc.,* 286 F.3d at 202 (4th Cir.2002).

5. The Fourth Circuit has held that salvors may be entitled to liberal salvage awards. "Such awards often exceed the value of the services rendered, and if no owner should come forward to claim the property, the salvor is normally awarded its total value." *Columbus–America Discovery Group,* 974 F.2d at 459 (4th Cir.

1992). An award for salvage generally far exceeds a mere remuneration *pro opere et labore* with the excess being intended not only to reward a specific salvor, but also to encourage others in similar circumstances to save property exposed to the perils peculiarly incident to the sea. *Columbus–America Discovery Group*, 974 F.2d at 468; *The Shreveport*, 42 F.2d 524, 534 (E.D.S.C.1930).

■ 6. Courts generally rely on the six factors set forth by the United States Supreme Court in *The Blackwall*, 77 U.S. (10 Wall.) 1, 14, 19 L.Ed. 870 (1869) to determine the amount of a salvage award. These factors are: (1) the labor expended by the salvors in rendering the salvage service; (2) the promptitude, skill, and energy displayed in rendering the service and saving the property; (3) the value of the property employed by the salvors in rendering the service, and the danger to which such property was exposed; (4) the risk incurred by the salvors in securing the property from the impending peril; (5) the value of the property saved; and (6) the degree of danger from which the property was rescued. *R.M.S. Titanic, Inc.*, 286 F.3d at 203–204; *Columbus–America Discovery Group*, 56 F.3d at 569 n. 17.

7. Reviewing these factors, the court finds that the crew of the BOLD VENTURE did expend a considerable amount of labor, and expose themselves to significant risk, in salvaging the Lifeboat. Captain Reiss testified that the BOLD VENTURE was 100 nautical miles out to sea in the middle of a wreckfish fishing voyage when he spotted the lifeboat in the middle of rough weather. Captain Reiss's uncontested testimony was that the winds were twenty to twenty-five knots and the seas had a five to seven foot swell with a three to four foot wind chop on top of it. Plaintiffs terminated their fishing voyage to save this lifeboat, not knowing at first whether there were people aboard, dead or alive. Over many hours, Captain Reiss risked his own life, the lives of his crew members, and the safety of his vessel (a sixty foot fishing trawler) by maneuvering alongside the unmanned lifeboat in very rough seas, helping his First Mate to jump from vessel to vessel, and devising a method to tow her with only the materials available aboard a fishing vessel. As such, Plaintiffs have shown that they promptly expended considerable labor in rendering the salvage service with such skill and energy that the lifeboat was delivered to port without damage. The BOLD VENTURE and its crew were all put at risk in securing the lifeboat from the impending peril of drifting unmanned in navigation channels during rough seas and in hurricane season. The court therefore finds that Plaintiffs have satisfied Factors One, Two, Three, and Four of *The Blackwall.*

8. The court now considers the fifth *Blackwall* factor: the value of the property saved. It is uncontroverted that only a FF800–style lifeboat would fit the ejector installed on the SKS TORRENS. Any other replacement lifeboat would have required significant modifications to the TORRENS that would have resulted in a higher cost. In September of 2004, a new replacement lifeboat to be delivered from Antwerpen, Germany would have cost the SKS TORRENS 775,000 Norwegian Kroner. On September 24, 2004, the day the Lifeboat was salvaged, the exchange rate for the Norwegian Kroner was 6.7747 Norwegian Kroner to 1.0000 U.S. Dollar. As such, at the relevant time, a replacement lifeboat cost $114, 396.21. While this price includes all of the SOLAS (Survival of Life at Sea) loose equipment, additional costs would include: pyrotechnics at a cost of 1,027 Norwegian Kroner ($151.59), food and water for 43 kroner per person (1,290 Kroner ($190.41) for 30 people), and an additional $12,000.00 to $14,000.00 to have a new lifeboat shipped to the United

States. As such, this court finds that the cost of replacing the lifeboat on September 24, 2004, would have been between $126,738.21 to $128,738.21.[1] According to Terry King, sales manager for Schat–Harding, used FF800–style lifeboats are not generally available in the marketplace; however, assuming one can be found, a used boat in perfect condition could be worth $100,000. Considering both the replacement cost, the unavailability of used vessels, and the possible market value of a used vessel, the court finds that a fair value of the salvaged Lifeboat is $110,000.

■■■■ 9. When evaluating the final factor, considerable significance must be given to whether the salved vessel was derelict at the time. A derelict vessel is defined as a vessel on navigable waters which is abandoned and deserted-whether by accident, necessity or voluntarily-without hope or intention of recovery by the owner. *Rowe v. the Brig,* 1 Mason 372, 20 F.Cas. 1281, 1282, No. 12,093 (C.C.Mass. 1818). At the time of the salvage in this case, the Lifeboat was unmanned lost property. There is no evidence that the owner searched for it, attempted to locate it, or even vaguely knew where to look for it. Additionally, the owner expressed no intention of finding it, but instead considered the Lifeboat a total loss and made immediate efforts to replace it. As such, the Lifeboat was a derelict vessel. The fact that a vessel is derelict implies a higher degree of danger in its rescue and,

thus, tends to raise the amount of award to the salvors. *The Blackwall,* 77 U.S. (10 Wall.) 1, 8, 19 L.Ed. 870 (1869). "Public policy is to encourage volunteers in the salvage of derelict, abandoned or distressed property. For this reason salvage awards in generous amounts have traditionally been given to successful salvors." *Rickard v. Pringle,* 293 F.Supp. 981, 984 (E.D.N.Y.1968) (citing *The Blackwall,* 77 U.S. at 13, 10 Wall. 1; *Anderson v. Edam,* 13 F. 135 (E.D.N.Y.1882)).

■■■ 10. Another important factor for consideration is that a derelict vessel presents an obstruction to navigation and a likely danger to commerce. *The Anna,* F. Cas. 398 (S.D.N.Y. 1872) *aff'd,* F. Cas. 401 (C.C.N.Y.1873). A vessel adrift, unlighted and abandoned in shipping lanes such as this lifeboat has been held to be "derelict property" for salvage purposes. *Tracor Marine Inc. v. M/V Margoth,* 403 F.Supp. 392, 394 (D.C.Canal Zone1975). In the present case, by taking the lifeboat under tow, the Plaintiffs removed the SKS TORRENS from potential liability from claims for damage or injury to vessels which might have collided with the lost Lifeboat.

■■■ 11. Accordingly, based on the foregoing, the court finds that this case is more than simply a mere towing case. This case involved the salvage of a derelict vessel. Taking into consideration the perils faced by the master and crew of BOLD VENTURE and the perils they spared the

1. This is the replacement value of the lifeboat. Although market value usually forms the basis for determining the value of a salvaged vessel, when there are insufficient sales to establish a market for said vessel, evidence such as replacement cost can also be considered to determine the value of the lost vessel. *See e.g., Margate Shipping Co. v. M/V Orgeron,* 143 F.3d 976, 990 (5th Cir.1998)(a salvage case in which "replacement cost" was determined to be the most appropriate measure to evaluate the loss of a space shuttle fuel tank); *see also*

*E.I. DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Service, Inc.,* 899 F.2d 377, 380 (5th Cir.1990) ("[w]hen no market value exists for a vessel, 'other evidence such as replacement cost ... can also be considered' "). In the present case, the court considers the replacement cost in determining the value of this lifeboat which was specially outfitted for the SKS TORRENS, as there was no evidence that a lifeboat could have been found on the open market to fit the TORRENS in September of 2004.

lifeboat and others in navigation through its salvage, the court finds that they are entitled to a larger award than one in an average salvage case involving a simple tow.

12. Historically, courts have held that the percentage of awards for derelict vessels ranges from one-third to one-half. *The Blackwall,* 77 U.S. 1, 8, 10 Wall. 1, 19 L.Ed. 870 (citing *Rowe* ); *The Shreveport,* 42 F.2d 524 (E.D.S.C.1930) (awarding one-third of the salved value); *The Flora Rodgers,* 152 F. 286 (D.C.S.C.1907) (salvor awarded one-half of the value of the derelict vessel in addition to expenses and losses incurred); *The Shawmut,* 155 F. 476 (D.C.S.C.1907) (awarding salvage award equal to one-third of the value of the derelict vessel and cargo); *The Myrtle Tunnel,* 146 F. 324 (D.C.S.C.1906) (awarding one-half of the proceeds of a derelict vessel and cargo); *The Bellona,* Bee 193, 6 F.Cas. 886, Mo. 3428 (D.S.C.1803) (awarding one-half the proceeds of vessel and cargo to salvors); *The Priscilla,* Bee 1, 12 F.Cas. 201, No. 6515 (D.C.S.C.1792) (one half of the net proceeds of sale of salved vessel).

13. In view of the foregoing, therefore, the court finds that Plaintiffs are entitled to a salvage award in the amount of 45% of the value of the salved vessel or **$49,500.00** together with the costs of this action and prejudgment interest at the appropriate rate.[2]

14. At the time of the salvage, the Plaintiffs were engaged in a fishing expedition working for predetermined shares of the profit from the catch. Because they jointly shared in the burden of salving the lifeboat, it is only equitable that the Plaintiffs share in any benefit from its recovery. The court find that the Plaintiffs shall be awarded individually from the following award in the same percentages for which each was working. As such, First Mate Hanson shall received 10% of the award, Second Mate Evans shall receive 9% of the award, Third Mate Atkins shall receive 8% of the award, and Captain Reiss, as owner and master of the BOLD VENTURE, shall receive the remainder.

**AND IT IS SO ORDERED.**

---

2. "Under maritime law, the awarding of prejudgment interest is the rule rather than the exception, and, in practice, is well-nigh automatic." *U.S. Fire Ins. Co. v. Allied Towing Corp.,* 966 F.2d 820, 828 (4th Cir.1992)(quoting *Reeled Tubing, Inc. v. M/V Chad G,* 794 F.2d 1026, 1028 (5th Cir.1986)).