AMES v. TWO HUNDRED AND SEVEN-
TY-FIVE CADDIES OF TOBACCO.

[See United States ex rel. Ames v. Nine Hun-
dred and Five Packages of Tobacco,
Case No. 15,881.]

---

AMES, (UNITED STATES v.)

[See United States v. Ames, Case No. 14,440.]

---

AMESBURY NAIL FACTORY, (ODI-
ORNE v.)

[See Odiorne v. Amesbury Nail Factory, Case
No. 10,430.]

---

# Case No. 330.

## The AMETHYST.

[2 Ware, (Dav. 20,) 28;[1] 2 N. Y. Leg. Obs.
312.]

District Court, D. Maine.    Jan. 21, 1840.

### SALVAGE—DERELICT—JOINT SALVORS—AWARD.

1. When property is left derelict on the high
seas, those who first find and take possession
of it, with the intention of saving it, acquire a
right to the exclusive possession, which others,
who afterwards discover it, have no right to
disturb.

[Cited in The W. D. B., Case No. 17,306.]

2. The right of property, in goods thus aban-
doned from necessity, is not lost to the owners,
and those who find and undertake to save them
are bound in good faith to consult the interest
of the owners as well as their own.    If they
have not sufficient force to effect the salvage
without great risk of the loss of the goods, they
cannot, consistently with the good faith which
they owe to the owners, refuse the assistance of
others, who offer their aid, and who may thus
become entitled as joint salvors to a share in
the reward.

[Cited in The Chickasaw, 41 Fed. 636.]

[See The Cairnsmore, 20 Fed. 519; The Ida
L. Howard, Case No. 6,999.]

In admiralty.    This was a case of salvage.
The Amethyst, a British vessel, sailed from
Boston to St. John, in New Brunswick,
May 1.    On the 3d, at 5 o'clock A. M., she
was struck by a heavy squall, and upset.
Of twelve persons on board, including pas-
sengers, ten saved themselves by hanging to
the wreck until 11 o'clock A. M., when they
were taken off by the schooner Compeer, of
Ellsworth.    Two were drowned, and their
bodies subsequently found on board the
wreck.    On the 7th of May, the schooners
May Flower, Ocean, and Wave sailed from
Boothbay on a fishing voyage, and fell in
with the wreck just before sunset.    She was
boarded from one of the schooners that even-
ing, and the skippers of the three schooners
agreed to lie by during the night, and tow her
into port next day.    She then lay about
fifteen or twenty miles south-east of the

[1][Reported by Edward H. Daveiss, Esq.]

island of Monhegan.    The three schooners
hoisted signal lights, and lay by in company
through the night, and remained so near the
wreck that she was seen at 10 and at 12
o'clock.    One was so near as to be in dan-
ger of coming in collision with her.    At
daylight the wreck was seen at the distance
of a mile or a mile and a half from the
schooners, according to the testimony of the
crews.    Another vessel was at the same time
seen bearing down on the wreck.    They
manned their boats for the purpose of resum-
ing the possession, but when they arrived,
they found that she had been boarded from
the stranger vessel, which had then come
up with her, and which proved to be the
Only Son, from St. Andrews, New Bruns-
wick, bound to Boston.    When the parties
met, a controversy arose between them, each
party claiming the right of prior possession.
That of the three schooners, said that they
had discovered and boarded her the night
before; the crew of the Only Son claimed
the right as having the actual possession.
Hard words and threats passed between
them; the party from the schooners cut the
lines, which were made fast to the wreck,
from the Only Son, and being superior in
numbers, maintained their possession.    The
crew of the latter vessel, during the dis-
pute, took from her an anchor, and secured it
on board their own vessel, and then were
compelled to abandon the prize to their ad-
versaries.    The schooners then made fast to
her with their cables, one before the other,
and proceeded with her in tow to Boothbay
harbor.    On the morning of the 8th, the
weather was pleasant and the sea calm:
but in the latter part of the day the wind
arose and increased to a storm, so that be-
fore they got into the harbor, the schooners,
one after another, parted their cables from
the wreck, which was driven on a dangerous
reef of rocks, and the schooners with some
difficulty saved themselves from the same
danger.    The next lay hands were procured
to assist in saving the property.    The prin-
cipal direction of the business, which was
attended with serious difficulties of differ-
ent kinds, was taken by Mr. M'Clintock,
who appears to have conducted with spirit,
prudence, and good faith.    The vessel lay
anchored to the sea, and the waves ran high;
the labor was severe, and the risk of life
not inconsiderable in getting the cargo from
the wreck; and, after it was landed, it was
necessary to employ men to guard and pro-
tect the property from persons who were
prowling around for the purpose of plunder.
[Decree for libellants.]

A claim was interposed by J. T. Sherwood,
her Britannic majesty's consul, for the own-
er, and the case was argued by Deblois, for
the claimants, and Howard, for the libellants.

WARE, District Judge.    This is a case of
salvage of a vessel and cargo, found derelict

and saved, under circumstances of considerable peril and severe labor; and it cannot be doubted that a liberal reward ought to be allowed, unless the claim of the salvors has been forfeited or impaired by misconduct on their part. It is contended that there has been such misconduct as ought justly to go either in diminution or to a forfeiture of their claims. The fact relied upon, as impairing their merits, is their refusal to accept the aid of the Only Son, in saving and securing the property, in consequence of which, it is argued that the vessel was finally lost upon the rocks, when the additional strength of another vessel might have saved her and brought her into port. It is contended that the master and crew of the Only Son being on the spot with their vessel, and ready to assist in the salvage, the libellants were bound to accept their assistance, and admit them as joint salvors; and they have in fact appeared and filed a claim for a share of the salvage.

As to the claim of the master and crew of the Only Son, it is to be remarked, that in the controversy that arose between the parties, they did not claim nor ask to be admitted as joint salvors. They claimed the sole and exclusive possession of the wreck, as being first in discovering and taking possession of it. Their avowed purpose was to exclude the libellants entirely, and take her into port themselves.

It is clear, upon the evidence, that when the Only Son discovered the wreck, it was in the legal possession of the libellants. The proof is that they discovered and boarded it on the evening of the 7th of May. They left no hands on board, it is true, to retain the actual and corporeal possession during the night, nor could men have remained on board during the night, without some risk of life. But they lay by in company, near the wreck, for the purpose of taking her in tow the next morning. The title which is acquired to property by finding, is a species of occupation; and it is laid down as a rule of law, by the civilians, that the mere discovery or sight of the thing is not sufficient to vest in the finder a right of property in the thing found. Pothier, Traite, de la Propriete, No. 63. His title is acquired by possession, and this must be an actual possession. He cannot take and keep possession by an act of the will, oculis et affectu, as he may when property is transferred by contract, and the possession given by a symbolical delivery. To consummate his title, there must be a corporeal prehension of the thing. Though it is said that it is established by custom (moribus receptum est) and that such was the ancient law of the Romans, when two are near together, or in company, where the thing is found, that the title is acquired in common. Pothier, Pandects, 41, 1, 8; Heineccius, Recitationes in Instit., § 350; Voet ad Pandect, 41, 1, 9. Upon these principles, the discovery of the wreck left dere-

lict, by the three schooners, and the boarding her from one of them, was sufficient to give them the right of possession. The three which were in company when she was discovered were entitled to share equally in the good fortune, though she was boarded and the actual possession taken by only one, for those who boarded took possession for the benefit of all. [See note at end of case.]

The right of possession having become perfect, was not lost by temporarily leaving the wreck, without the intention of ultimately abandoning it, but with the purpose of returning and resuming the actual possession, and carrying her to a place of safety the next morning. Things being once in our possession remain so, while they are subject to our custody, and are so situated that we can resume the actual possession at pleasure; and this principle is equally applicable whether the right of dominion is acquired by finding or by an onerous title. Pothier, Traite de la Possession, No. 79; Vinnius. In Just. Inst. lib. 2, 1, 18. When, therefore, the wreck was discovered by the Only Son, on the morning of the 8th, the fishermen, though not in the actual possession, pedis positione, had that kind of possession that preserved all the possessory rights which they acquired the night before. Having discovered and taken the property into their hands, they had a right to retain it for the purpose of carrying it to a place of safety, and entitling themselves to the reward allowed in such cases, and to exclude all others from interfering with their possession. They had not only acquired rights, but had come under obligations with respect to the property. The finder of property, left derelict at sea, does not acquire the dominion or the absolute property in what is found. He acquires the right of possession only, with a title to a reasonable reward for his services, when the property is brought to a place of safety. The finders were, therefore, bound, unless they chose to abandon it, to exert themselves with all due care, fidelity, and vigilance, to preserve and protect the residuary interest remaining in the true owners. The master and crew of the Only Son, although they doubtless supposed that they were the first discoverers of the wreck, had no right to disturb the possession of the libellants; and as they were not in sight when the schooners first discovered and took possession of it, they have no just grounds for claiming to be admitted as joint salvors.

But although the libellants may have had the right of exclusive possession, they were bound to use every reasonable precaution to insure the safety of the property, for the benefit of the owners, and it is argued, therefore, that it was their duty to accept the aid of the Only Son, though they might thereby diminish their share of the salvage. It is true that salvors are bound to act with good faith towards the owners, and this obliges

them to use all reasonable and available means to insure the safety of the property. They are influenced, primarily, in engaging in the service, by the expectation of reward. But when once they have engaged in the business, their own interest is not alone involved. When the goods are rescued from danger and brought to a place of safety, they are saved for the owner, after deducting a just and proper compensation for the salvors. A person undertaking to save derelict goods stands, in relation to the owner, somewhat in the character of a negotiorum gestor of the Roman law, that of a voluntary agent who interferes in the affairs of another without a mandate or authority, and he is bound to act for the interest of the owner as well as his own. Generally the interest of both will be the same, that of conveying the goods to a place of safety without loss and expense; but if it is otherwise, it would be a violation of good faith for a salvor to look solely to the enhancing of his reward at the expense of the owner. The golden rule, of dealing with others as we would have others deal with us, is a principle of social duty, deeply laid in morals and in the constitution of human nature; and in these cases of providential calamity, it is a rule of law as well as of morals. If the finder cannot, with his own force, convey the property to a place of safety, without imminent risk of a total or material loss, he cannot, consistently with his obligations to the owner, refuse the assistance of other persons proffering their aid, or exclude them from rendering it, under the pretext that he was the first finder and had thus gained a right to the exclusive possession. The principles of good faith are of universal obligation, and binding in all cases in which the interests of others are involved.

Upon this part of the argument the question is, whether the three schooners with their own crews, constituted a force apparently sufficient for the service, under the circumstances of the case. For if the force was manifestly inadequate, so that the attempt to save the wreck, without other assistance, would be exposing the property to great hazard, then it was their duty not merely to accept, but to solicit aid, and not expose the property of the owner to a total loss, in their eagerness to enhance their own reward. The Amethyst was a vessel of 98 tons; the schooners were smaller, one being of 60, one of 55, and one of 45 tons; but each was manned with a full crew of fishermen, amounting in the whole to eighteen men. The weather was calm, and the wreck lay about fifteen miles from the island of Monhegan, in which there is no harbor, and about double that distance from the safe harbor of Boothbay. To one not versed in nautical affairs this would appear to be a sufficient force to tow the wreck into port, with ordinarily favorable weather, and the prospect of the morning was that of good weather. The prudence and propriety of men's actions are not to be judged by the event, but by the circumstances under which they act. If they conduct with reasonable prudence and good judgment, they are not to be made responsible because the event. from causes which could not be foreseen nor reasonably anticipated, has disappointed their expectations. The schooners took the wreck in tow, and had, without difficulty, carried her nearly to a place of safety, when the weather having become boisterous, the cables broke, one after another, from the violence of the tempest, from their holdings, and at last from the wreck, and she was carried by the waves on a dangerous reef of rocks, so that the vessel was nearly a total loss. Now it is not apparent how another vessel, of about the same tonnage as the fishermen, would prevent this calamity. If the weather had continued favorable, the three were sufficient; and in the storm which arose, it is not probable that the presence of the Only Son would have insured, or could have contributed much towards, her safety. On the facts proved, it does not appear that the libellants would have been chargeable with any fault which would impair their claims for salvage, by declining to admit their participation in the service, if it had been offered. But in point of fact it was not offered.

The whole mass of property saved in this case is small; the value, after deducting expenses, amounting only to $841.12, the largest part of one moiety of which is exhausted by the necessary expenses of getting the property ashore and securing it, after the wreck went on the rocks. So that leaving but a pittance for the owners. the compensation of the salvors will scarcely amount to a quantum meruit, for the laborious and dangerous service of rescuing the goods from the waves, and I may add, saving them from pillage from the piratical shoresmen, after they were landed. I shall allow $400 salvage, leaving the cost and expenses a charge on the residue.

Decree: This case came on to be heard upon the libel, answer, depositions, and exhibits in the cause, and was argued by counsel; upon consideration whereof it is ordered, adjudged, and decreed, that there be allowed, out of the proceeds of the sale of the savings of the wreck of the vessel and the cargo now in the registry, the sum of $400 as salvage. And it is further ordered, adjudged, and decreed, that of said sum of $400 there be allowed and paid to—

The owners of the schooner Ocean.............$40
The owners of the schooner Wave ............. 40
The owners of the schooner May Flower....... 40
                                           ————
                                           $120

—and that the residue of the said sum of $400, to wit: the sum of $280, be divided into twenty shares, and that there be allowed and paid to—

Samuel M'Clintock, who superintend-
ed the landing of the goods, etc., 1 share, $14

| Moses Lewis, skipper of schooner Ocean, | 2 | do. | 28 |
| George Brewer, skipper of schooner Wave, | 2 | do. | 28 |
| John Hotten, skipper of schooner May Flower, | 2 | do. | 28 |
| Benjamin Orchard, | 1 | do. | 14 |
| James Lowry, | 1 | do. | 14 |
| John Knowles, | 1 | do. | 14 |
| Morrill Thompson, | 1 | do. | 14 |
| —— ——, cook, | 1 | do. | 14 |
| Benjamin Gray, boy, | ½ | do. | 7 |
| Freeman Reed, | 1 | do. | 14 |
| James C. Auld, | 1 | do. | 14 |
| Samuel Brewer, | 1 | do. | 14 |
| Caleb S. Reed, | 1 | do. | 14 |
| Ira Quimby, | 1 | do. | 14 |
| James Gould, | 1 | do. | 14 |
| William Huff, boy, | ½ | do. | 7 |
| Samuel Montgomery, do. | ½ | do. | 7 |
| William Hotten, do. | ½ | do. | 7 |
| | 20 | | 280 |
| | | | 120 |
| | | | $400 |

(Benjamin Orchard through Benjamin Gray: Crew of the Ocean. Freeman Reed through Caleb S. Reed: Crew of the Wave.)

And it is further ordered, that all costs and expenses be charged on the residue of the proceeds of the sale remaining in the registry, amounting to $441.12, and after deducting the same that the remaining sum be paid to Joseph T. Sherwood, Esq., her Britannic majesty's consul, and the authorized attorney of the claimants, for their use. And it is further ordered, that the sum of thirty dollars, found on the person of —— ——, a passenger found on board the vessel, drowned, now in the hands of Thomas Cunningham, coroner, after deducting ten dollars to be paid Samuel M'Clintock for the expenses of his interment, be paid to the said Joseph T. Sherwood, for the use of the legal heirs of the deceased.

NOTE. [from original report.] It is, says Pothier, an ancient pretension, that of claiming a part of a thing found, on the pretext of having seen it at the same time; we find it in Plautus. In Rudente, act 4, scene 3. Trachalion claimed a share in a valise which Gripus had fished up from the sea. On this demand, Gripus asks, "Quemne ego excepi e mari?" Trachalion coolly replies, "Et ego inspectavi e littore."
Phaedrus commemorates the same pretension in a dispute between two bald men for a comb,—
"Invenit calvus forte in trivio pectinem;
Accessit alter aeque defectus pilis;
Eia, inquit, in commune quodcunque est lucri;"
—this is a windfall for both of us.